**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Julie Dalton, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNIQLO USA LLC, <br><br> Defendant. | Civil Case No.: <br><br><br> **CLASS ACTION COMPLAINT** |

## INTRODUCTION

1.     This case arises because Defendant's Website (www.uniqlo.com) (the "Website" or "Defendant's Website") is not fully and equally accessible to people who are blind or who have low vision in violation of both the general non-discriminatory mandate and the effective communication and auxiliary aids and services requirements of the Americans with Disabilities Act 42 U.S.C. § 12181, *et seq*. (the "ADA") and its implementing regulations. In addition to her claim under the ADA, Plaintiff also asserts a companion cause of action under the Minnesota Human Rights Act (MHRA). Plaintiff seeks a permanent injunction requiring a change in Defendant's corporate policies to cause its online store to become, and remain, accessible to individuals with visual disabilities; a civil penalty payable to the state of Minnesota pursuant to Minn. Stat. 363A.33, Subd. 6 and Minn. Stat. § 363A.29, subd. 4 (2023); damages, and a damage multiplier pursuant to Minn. Stat. § 363A.33, subd. 6 (2023), and Minn. Stat. § 363A.29, subd. 4 (2023).

2.     As the National Federation of the Blind has explained:

In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication, and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard-of-hearing person does not have the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity Websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.

*See* Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "*Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities*," C RT Docket No 128, RIN 119 -AA65, Answer 57 (October 7, 2016) (citations omitted).

3.      Plaintiff, on behalf of herself and others who are similarly situated, seeks relief including an injunction requiring Defendant to make its Website accessible to Plaintiff and the putative class; and requiring Defendant to adopt sufficient policies, practices, and procedures, the details of which are more fully described below, to ensure that Defendant's Website remains accessible in the future. Plaintiffs also seek an award of statutory attorney's fees and costs, damages, a damages multiplier, a civil penalty, and such other relief as the Court deems just, equitable, and appropriate.

4.      The injunctive relief that Plaintiff seeks will inure to the benefit of an estimated 2.3 percent of the United States population who reports having a visual disability. *See* Erickson, W., Lee, C., von Schrader, S., *Disability Statistics from the American Community Survey (ACS)*, Cornell University Yang-Tan Institute (YTI), www.disabilitystatistics.org (last accessed Apr. 12, 2022).

5.      It will also benefit Defendant, who will extend its market reach to this population. *See* Sharron Rush, *The Business Case for Digital Accessibility*, W3C Web Accessibility Initiative (Nov. 9, 2018), https://www.w3.org/WAI/business-case/ (last accessed Apr. 12, 2022) ("The global market of people with disabilities is over 1 billion people with a spending power of more than $6 trillion. Accessibility often improves the online experience for all users.").

## PRELIMINARY FACTS

6.      In a September 25, 2018, letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the Website they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' Website over 20 years ago. This interpretation is consistent with the ADA's Title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018).

7.      Plaintiff and the members of the putative class are blind and low-vision individuals and are reliant upon screen reader technology to navigate the Internet.

8.      Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user."

3

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use Websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory – rather than visual – cues to relay this same information. When a sight-impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable." … Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a Website by listening and responding with her keyboard.

9.      Web-based technologies have features and content that are modified on a daily, and in some instances on an hourly basis. As a result, a one-time "fix" to an inaccessible Website will not cause the Website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. Jonathan Lazur et al., *Ensuring Digital Accessibility Through Process and Policy* 140 (2015).

10.      As one leading commentator notes,

> The most significant problem is maintaining the accessibility of a large commercial site. Without policies, procedures, and metrics—such as testing a release for accessibility before posting to the Website and training in accessible design (so that accessibility is part of the design process the way, say, cybersecurity is)—the site's status as accessible will be temporary at best.

*See Fighting for Accessible Website under the ADA: Daniel Goldstein, Brown Goldstein Levy, Baltimore*, Bloomberg BNA, Jan. 13, 2016, ISSN 1098-5190

(reproduced with permission from Electronic Commerce & Law Report, 21 ECLR, 2, 1/13/16)

11.    To evaluate whether an inaccessible Website has been rendered accessible and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the Website to remain accessible, the Website must be reviewed on a periodic basis using both automated accessibility screening tools, manual and end-user testing by disabled individuals.

> [I]f you have planned to redesign or add a certain segment to your site, then make it accessible from the start. It's far cheaper to plan for an elevator than to decide to add one once your 30-story building is complete. Or if you are re-branding, consider using templates that will ensure accessibility. Make sure you have policies, procedures, and metrics in place so that you know if you are maintaining accessibility and can identify why, if you are not. Most of all, consult disabled consumers or a consumer organization before deciding what you are going to do and have consumers actually test the changes.
>
> Something you imagine you may need to do, you may not need to do at all, or may be able to do much cheaper. Something you hadn't thought to do may be critical to accessibility. And, of course, if you work with the disability community, they will spread the word that this is no longer a site to be avoided, but to be used.

*Id*. at 3.

12.    "As technology continues to evolve at a rapid pace, it is important to consider factors that can facilitate or impede technology adoption and use by people with disabilities." *National Disability Policy: A Progress Report*, Nat'l Council on Disability (Oct. 7, 2016), https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf.

13.     This is especially true with respect to accessing goods and services over the internet, where people with disabilities stand to benefit immensely if online services are fully and equally accessible to them.

14.     When digital content is properly formatted, it is universally accessible to everyone. When it's not, the content provider fails to communicate with individuals with a visual disability effectively. In turn, these individuals must expend additional time and effort to overcome communication barriers not applicable to sighted users, which may require the assistance of third parties or, in some instances, deny outright access to the online service.

15.     Such difficulties often lead disabled individuals to abandon the process of purchasing items online after they begin. *See* Kasey Wehrum, *Your Website is Scaring Customers Away. 5 Easy Ways to Fix It.*, Inc. Mag. (Jan. 2014), https://www.inc.com/magazine/201312/kasey-wehrum/how-to-getonline-customers-to-complete-purchase.html (documenting the most common causes of shopping cart abandonment, including: "Your Checkout button is hard to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout process takes multiple clicks.").

## JURISDICTION AND VENUE

16.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

17.     Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24 hours a day, 7 days a week, 365 days a

year which, through its Website, enters into contracts for the sale of its products with residents of Minnesota and participates in the State of Minnesota's economy by offering and providing services over the internet to Minnesota residents, including Plaintiff.

18.   Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred. As described in additional detail below, Plaintiff was injured when she attempted to access Defendant's Website from Minnesota but encountered barriers that denied her full and equal access to Defendant's online goods, content, and services.

## PARTIES

19.   Plaintiff is and, at all times relevant hereto, has been a resident of Minnesota.

20.   Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore disabled under the ADA, 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

21.   Defendant UNIQLO USA LLC is a New York Company and is headquartered at 88 Crosby Street, Floor 3, New York, New York 10012.

22.   Defendant does business within and around the State of Minnesota.

23.   Defendant offers apparel and accessories for sale including, but not limited to, tops, bottoms, dresses, loungewear, sweaters, jackets, underwear, accessories and more.

## ADDITIONAL FACTUAL ALLEGATIONS

24.   In order to browse, research, or shop online and purchase the products and services that Defendant offers, individuals may visit Defendant's Website.

25.    Defendant owns, operates, and/or controls its Website and is responsible for the policies, practices, and procedures concerning the Website's development and maintenance.

26.    As a consequence of her experience visiting Defendant's Website, including in the past year, and from an investigation performed on her behalf, Plaintiff found Defendant's Website has a number of digital barriers that deny screen-reader users like Plaintiff full and equal access to important Website content – content Defendant makes available to its sighted Website users. For example:

a.    Defendant's Website fails to alert screen readers to "pop-up" window content. Instead, screen readers remain focused on the content of the Website's underlying page. As a result, pop-up content Defendant deems sufficiently important to convey to its sighted Website visitors is completely unavailable to screen reader users;

b.    The purpose of certain links and/or buttons on Defendant's Website is not clear from their context or associated narration. As a result, screen reader users cannot understand what the link and/or button does, making navigation an exercise in trial and error;

c.    Defendant's Website fails to recognize and read a size-chart menu. As a result, the size-chart menu content Defendant deems sufficiently important to convey to its sighted Website visitors is completely unavailable to screen reader users;

d.    Defendant's Website uses visual cues as the only means of conveying information, making the information unavailable to screen reader users;

e.    Defendant's Website includes moving content that is not narrated and as a result, scrolling content Defendant deems sufficiently important to convey to its sighted Website visitors is completely unavailable to screen reader users; and

f.    Defendant's Website presents content with an illogical and confusing tab and focus order.

27.     Still, Plaintiff would like to, intends to, and will attempt to access Defendant's Website in the future to browse, research, or shop online and purchase the products and services that Defendant offers.

28.     Defendant's policies regarding the maintenance and operation of its Website fail to ensure its Website is fully accessible to, and independently usable by, individuals with vision-related disabilities.

29.     Plaintiff and the putative class have been, and in the absence of injunctive relief will continue to be, injured, and discriminated against by Defendant's failure to provide its online Website content and services in a manner that is compatible with screen reader technology.

## CLASS ALLEGATIONS

30.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), individually and on behalf of the following class:

> All blind or have a low vision disability within the meaning of the ADA who use screen reader auxiliary aids to navigate digital online content and who have accessed, attempted to access, or who may access or attempt to access Defendant's Website.

31.     This action is a prototypical civil-rights action of the kind expressly contemplated for class-certification by the draftsman of Fed. R. Civ. P. 23(b)(2). The note to the 1966 amendment to Rule 23 states: "Subdivision (b)(2). This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. . . Illustrative are various actions in the civil rights filed where a party is charged with

9

discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." See also, *Newberg on Class Actions* § 4:40 (5th ed. 2014) ("The types of civil rights cases that have often been certified as (b)(2) class actions include . . . disability discrimination actions under the Americans with Disabilities Act (ADA).").

### NUMEROSITY

32.     The class described above is so numerous that joinder of all individual members in one action would be impracticable.

33.     According to the United States Department of Justice: "The U.S. Census Bureau's 2002 Survey of Income and Program Participation (SIPP) found that there are 51.2 million people with disabilities in the United States . . . Millions of people with disabilities regularly travel, shop, and eat out with family and friends . . . The Administration on Aging projects that by 2030 there will be more than 69 million people aged 65 and older, making up approximately 20% of the total U.S. population. The large and growing market of people with disabilities has $175 billion in discretionary spending, AARP says that four million Americans turn 50 each year and that people aged 50 and older spent nearly $400 billion in 2003. At age 50, adults are likely to experience age-related physical changes that may affect hearing, vision, cognition, and mobility."

34.     According to the American Foundation for the Blind, an estimated 32.2 million adult Americans (or about 13% of all adult Americans) reported they either "have trouble" seeing, even when wearing glasses or contact lenses, or that they are blind or unable to see at all.

35.     According to The National Federation of the Blind, the number of non-institutionalized individuals reported to have a visual disability in the United States in 2016 is 7,675,600 -- 86,500 of whom reside in Minnesota.

36.     According to the National Institutes of Health (NIH), the number of people with visual impairment or blindness in the United States is expected to double to more than 8 million by 2050, according to projections based on the most recent census data and from studies funded by the National Eye Institute, part of the National Institutes of Health. Another 16.4 million Americans are expected to have difficulty seeing due to correctable refractive errors such as myopia (nearsightedness) or hyperopia (farsightedness) that can be fixed with glasses, contacts, or surgery.

37.     According to the United States Center for Disease Control and Prevention (CDC), Vision disability is one of the top 10 disabilities among adults 18 years and older.

38.     An estimated 2.3 percent of the United States population reports having a visual disability. *See* Erickson, W., Lee, C., von Schrader, S., *Disability Statistics from the American Community Survey (ACS)*, Cornell University Yang-Tan Institute (YTI), www.disabilitystatistics.org (last accessed Apr. 12, 2022).

39.     The U.S. Chamber of Commerce has documented consumers' increasing reliance on the Internet to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a number that's continuing to rise. The convenience, affordability, and ability to compare prices with ease has led more and more customers to visit e-commerce sites before heading to a brick-and-mortar location.

*See* Emily Heaslip, *A Guide to Building an Online Store*, U.S. Chamber of Commerce (Sept. 20, 2019), https://www.uschamber.com/co/start/startup/how-to-build-online-stores.

11

40.     Researchers have determined that: 95% of consumers will buy at least half of their gifts online. The Leanplum survey found that 80% of respondents shop on their mobile devices.  *See* Emily Heaslip, *Ways to Optimize Your E-Commerce Site for Mobile Shopping*,     U.S.     Chamber     of     Commerce     (Jan.     6,     2020), https://www.uschamber.com/co/run/technology/building-mobilefriendly-commerce-Websites.

41.     According to at least one report, e-commerce is growing at the rate of 23% each year. *See* Emily Heaslip, *The Complete Guide to Selling Online*, U.S. Chamber of Commerce   (Jan.   28,   2020),   https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide.

42.     "The global market of people with disabilities is over 1 billion people with a spending power of more than $6 trillion. Accessibility often improves the online experience for all users."). *See* Sharron Rush, *The Business Case for Digital Accessibility*, W3C Web Accessibility Initiative (Nov. 9, 2018), https://www.w3.org/WAI/business-case/

43.     These facts easily permit a common-sense inference that the numerosity requirement has been met in this matter.

44.     In addition, Plaintiff anticipates that the record evidence gathered during discovery will further demonstrate that Rule 23(a)(1) has been satisfied in this matter.

## TYPICALITY

45.     Plaintiff's claims are typical of the claims of the members of the classes. The claims of Plaintiff and members of the classes are all based on the same legal theory and

all arise from the same unlawful conduct. Plaintiff and the class members all have the same grievance and are all entitled to the same relief.

46.     Plaintiff's interests align with the interests of the putative classes because she and each class member seek injunctive relief requiring Defendant to make changes to its existing Website and related policies, practices, and procedures in order to ensure Defendant's Website become and remain ADA compliant, relief that would benefit all members of the proposed classes.

## **COMMON QUESTIONS OF FACT AND LAW**

47.     There are factual and legal issues common to Plaintiff and all class members. As explained herein, Defendant's Website violates the ADA, and Defendant's policies, practices, and procedures fail to ensure that its Website does not discriminate against people who are blind or have low vision within the meaning of the ADA. And this Court can remedy Defendant's violation of the ADA by issuing an injunction requiring changes to Defendant's Website and to its related policies, practices, and procedures. Accordingly, "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2), including:

a.     Whether Defendant's Website fails to provide individuals who are blind or have low vision with the appropriate auxiliary aids and services necessary to ensure effective communication with individuals with disabilities who rely on scree-reader technology in violation of Title III of the ADA and its implementing regulations and the MHRA;

b.     Whether Defendant's Website-related policies, practices, and procedures discriminate against Plaintiff and putative class members in violation of Title III of the ADA and its implementing regulations and the MHRA; and

c.     What measures are available to remedy the concerns of Plaintiff and the putative class.

48.     Whether and to what extent Defendant's Website and related policies, practices, and procedures are unlawful presents a common question with only one answer: Defendant's Website and related policies, procedures, and practices either violate the ADA and the MHRA or they do not. If Defendant's Website and related policies, procedures, and practices are discriminatory, then each class member is entitled to injunctive relief. On the other hand, if the Website and related policies, procedures, and practices do not violate the ADA and the MHRA, then no class member is entitled to injunctive relief. Either way, this proceeding will generate a common answer, the determination of which "will resolve an issue… central to the validity of each one [of the class members'] claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

## ADEQUACY OF REPRESENTATION

49.     Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the class and has no interests antagonistic to the members of the class. Plaintiff has retained counsel who is competent and experienced in the prosecution of class action litigation and who possesses substantial ADA expertise.

## CAUSES OF ACTION

## VIOLATION OF TITLE III OF THE ADA

50.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its Website, it has violated the ADA's general non-discriminatory mandate.

51.     Specific provisions within the ADA require, *inter alia*, that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1).

52.     The regulations set forth numerous examples of "auxiliary aids and services," including "… accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b).

53.     Auxiliary aids and services include but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, and other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

54.     The term "auxiliary aids and services" also includes the "[a]cquisition or modification of equipment or devices; and [o]ther similar services and actions." *Id*.

55.     The ADA Title III regulations further require that "[i]n order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." *Id.* (emphasis added).

56.     The House Committee on Education and Labor stated that it intended "that the types of accommodation and services provided to individuals with disabilities, under

all of the titles of this bill, should keep pace with the rapidly changing technology of the times," and that technological advances "may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities." H.R. Rep. No. 101-485, pt. 2, at 108 (1990).

57.     Similarly, the United States Department of Justice, in promulgating the rules implementing Title III in 1991, explained that it was "not possible to provide an exhaustive list [of auxiliary aids and services], and such an attempt would omit new devices that will become available with emerging technology." 28 C.F.R. pt. 36, App. C, p. 912 (discussion of § 36.303).

58.     As the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc*., 630 F.3d 1153, 1163 (9th Cir. 2011).

59.     By failing to provide its Website's content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

    a.    denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Website;

    b.    affording individuals with visual disabilities access to its Website that is not equal to, or effective as, that afforded others;

    c.    utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

d.   denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

e.   failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

60.   Defendant has violated Title III by, without limitation, failing to make its Website's services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Website, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

61.   Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Website to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

62.   Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

63.   Pursuant to 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

**VIOLATION OF THE MHRA**

64.   Minn. Stat. § 363A.11 provides: It is an unfair discriminatory practice: (1) to deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of […] disability […]; or (2) for a place of public accommodation not to make reasonable accommodation to the known physical, sensory, or mental disability of a disabled person.

17

65.     Under the general prohibitions established by the MHRA, Minn. Stat. § 363A.11, subd. 2 (2023), it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that is equal to the opportunities afforded to other individuals.

66.     Defendant has engaged in unfair discriminatory practices against Plaintiff and others in that it has failed to ensure that Defendant's Website and online content is fully accessible to persons with disabilities on an independent and equal basis in violation of the MHRA, and Minn. Stat. § 363A.11 (2023).

67.     Plaintiff has been denied full and equal access to the Website and has been denied the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations offered therein on a full, independent, and equal basis.

68.     Plaintiff is without adequate remedy at law, has suffered, and is suffering irreparable harm.

69.     This Court has authority under Minn. Stat. § 363A.33, subd. 6 (2023), and Minn. Stat. § 363A.29, subd. 3-4 (2023), to issue an order directing Defendant to cease and desist from their unfair discriminatory practices and to take affirmative action to make its Website readily accessible to and independently usable by individuals with disabilities.

70.     The Court has authority under Minn. Stat. § 363A.33, subd. 6 (2023), and Minn. Stat. § 363A.29, subd. 4 (2023), to order Defendant to pay a civil penalty to the state of Minnesota.

71.    The Court has authority under Minn. Stat. § 363A.33, subd. 6 (2023), and Minn. Stat. § 363A.29, subd. 4 (2023), to award damages, and a damage multiplier pursuant.

72.    Plaintiffs have retained the undersigned counsel for the filing and prosecution of this action and are entitled to recover reasonable attorneys' fees from Defendant as part of the costs, pursuant to Minn. Stat. § 363A.33, subd.7 (2023).

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

(A)    An order certifying the proposed Class, appointing Plaintiff as representative of the proposed Class, and appointing undersigned counsel as counsel for the proposed Class;

(B)    A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, and the MHRA, in that Defendant took no action that was reasonably calculated to ensure Defendant communicated the digital content of its Digital Platform to individuals with disabilities effectively such that Plaintiff could fully, equally, and independently access Defendant's products and services;

(C)    A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) and Minn. Stat. § 363A.33, subd. 6 (2023), and Minn Stat. § 363A.29, subd. 3 (2023), which directs Defendant to take all steps necessary to communicate the content of its Digital Platform to screen reader users effectively

19

such that Defendant's online products and services are fully, equally, and independently accessible to individuals with visual disabilities, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully below.[1]

(1)   Within 90 days of the Court's Order, Defendant shall complete an accessibility audit of its Digital Platform that will examine the accessibility and usability of the Digital Platform by consumers who are blind.

(2)   Within 180 days of the Court's Order, Defendant shall develop a corrective action strategy ("Strategy") based on the audit findings. In addition to the deadlines outlined below, the Strategy shall include dates by which corrective action shall be completed.

(3)   Within 210 days of the Court's Order, Defendant shall disseminate the Strategy among its executive-level managers, employees, and contractors, if any, involved in digital development and post it on the Digital Platform.

(4)   Within 90 days of the Court's Order, Defendant shall develop a Digital Accessibility Policy Statement that demonstrates its commitment to digital accessibility to blind and other vision-disabled consumers, as required by the Americans with Disabilities Act. This Policy Statement shall be posted in the header of each homepage on the Digital Platform within 120-days of the Court's Order and shall disclose that an audit is taking or has taken place and that a Strategy will be disseminated and posted on the Digital Platform within 180-days of the Court's Order.

(5)   Within 240 days of the Court's Order, Defendant shall develop procedures to implement its Digital Accessibility Policy across the entire

---

[1] The injunctive relief herein is consistent with a 2011 settlement agreement entered into between National Federation of the Blind and The Pennsylvania State University, available at https://accessibility.psu.edu/nfbpsusettlement/ (last accessed Apr. 12, 2022); a 2014 settlement agreement between the U.S. Department of Justice and Ahold U.S.A., Inc. and Peapod, LLC, supra note 47; and a 2014 Resolution Agreement between the U.S. Department of Education and Youngstown State University, available at https://www2.ed.gov/documents/pressreleases/youngstown-state-universityagreement.pdf

Digital Platform. Defendant shall disseminate its Policy and procedures to its executive-level managers, employees, and contractors, if any, involved in digital development.

(6) Within 12 months of the Court's Order, Defendant shall conduct training, instruction, and support to ensure that all executive-level managers and employees involved in digital development are aware of and understand the Digital Accessibility Policy, including proper procedures, tools, and techniques to implement the Digital Accessibility Policy effectively and consistently.

(7) Within 12 months of the Court's Order, Defendant shall hire or designate a staff person with responsibility and commensurate authority, to monitor the Digital Accessibility Policy and procedures.

(8) Within 12 months of the Court's Order, Defendant shall develop and institute procedures that require third-party content and plug-ins built into the Digital Platform to provide blind consumers the same programs, benefits, and services that they do to individuals without disabilities, except that when it is technically unfeasible to do so. Defendant shall effectuate these obligations by, among other things, implementing as part of its Request for Proposal process language that bidders meet the accessibility standards set forth in WCAG 2.1 Level AA for web-based technology and the Americans with Disabilities Act; requiring or encouraging, at Defendant's discretion, as part of any contract with its vendors, provisions in which the vendor warrants that any technology provided complies with these standards and any applicable current federal disability law.

(9) Within 18 months, all pages hosted on the Digital Platform that have been published shall be Accessible to blind users. "Accessible" means fully and equally accessible to and independently usable by blind individuals so that blind consumers are able to acquire the same information, engage in the same interactions, and enjoy the same services as sighted consumers, with substantially equivalent ease of use.

(10) Defendant shall not release for public viewing or use a substantial addition, update, or change to the Digital Platform until it has determined through automated and manual user testing that those proposed additions, updates, or changes are Accessible.

(11) Defendant shall conduct (a) an automated scan monthly and (b) manual end-user testing quarterly thereafter to ascertain whether any newly posted content is accessible. Defendant shall notify all employees and

21

contractors, if any, involved in digital development if corrections to the Digital Platform are needed and of reasonable timelines for corrections to be made. Defendant shall note if corrective action has been taken during the next monthly scan and quarterly end-user test.

(12) Following the date of the Court's Order, for each new, renewed, or renegotiated contract with a vendor of Third-Party Content, Defendant shall seek a commitment from the vendor to provide content in a format that is Accessible.

(13) Defendant shall provide Plaintiff, through his counsel, with a report on the first and second anniversaries of the Court's Order which summarize the progress Defendant is making in meeting its obligations. Additional communication will occur before and after each anniversary to address any possible delays or other obstacles encountered with the implementation of the Digital Accessibility Policy.

(D) Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(E) Payment of costs of suit;

(F) Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment;

(G) That the Court order Defendant to pay a civil penalty to the state pursuant to Minn. Stat. § 363A.33, subd. 6 (2023), and Minn. Stat. § 363A.29, subd. 4 (2023);

(H) An award of damages, and a damage multiplier pursuant to Minn. Stat. § 363A.33, subd. 6 (2023), and Minn. Stat. § 363A.29, subd. 4 (2023);

(I)     Whatever other relief the Court deems just, equitable, and appropriate; and

(J)     An Order retaining jurisdiction over this case until Defendant has complied

with the Court's Orders.

Date: March 25, 2026

THRONDSET MICHENFELDER, LLC

*/s/Patrick W. Michenfelder*
Patrick W. Michenfelder (#024207X)
Chad A. Throndset (#0261191)
Jason Gustafson (#0403297)
80 S. 8th Street, Suite 900
Minneapolis, MN 55402
Tel: (763) 515-6110
pat@throndsetlaw.com
chad@throndsetlaw.com
jason@throndsetlaw.com
*Attorneys for Plaintiff*

23